IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORY STALLING, Special Administrator )<br>of the Estates of BECKY R. STALLING and )<br>RYAN NICHOLE STALLING, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNION PACIFIC RAILROAD COMPANY )<br>and NATIONAL RAILROAD PASSENGER )<br>CORPORATION d/b/a AMTRAK, )<br>)<br>Defendants. ) | No. 01 C 1056<br>Paul E. Plunkett, Senior Judge |

## MEMORANDUM OPINION AND ORDER

Gregory Stalling ("Plaintiff") has filed a three-count complaint against Union Pacific Railroad Company ("UP") and National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak") or collectively ("Defendants") for their negligence and willful and wanton conduct. Before the Court is Defendants' motion to bar the expert testimony of Dr. Harvey Levine pursuant to Federal Rule of Evidence 702. For the reasons stated below, Defendants' motion is granted.

### Background

Plaintiff, Gregory Stalling, brought this wrongful death suit on behalf of his deceased wife, Becky, and daughter, Ryan. On January 14, 2001, at approximately 5:00 p.m. Becky was driving through the Livingston Road railroad crossing in Dwight, Illinois and was struck by a train. Union

-1-

Pacific ("UP") is a company that operates trains in Illinois and owns the tracks located at the Livingston Road crossing in Dwight, Illinois. (Defs.' L.R. 56.1(a)(3) Stmt. ¶ 1.) In 2001, the Livingston crossing displayed advanced warning signs to indicate there is a railroad ahead, as well as reflective cross bucks on each side of the crossing. (*Id.* ¶¶ 11, 13.) These crossbuck signs are circular with an "X" sign indicating that there are railroad tracks are ahead. The crossbucks also had reflective tape placed on them, were in good condition and were able to be seen at night by approaching drivers. (*Id.* ¶¶ 16, 17.) Crossbucks are the equivalent of yield signs and in January 2001, they were not obstructed and were clear to pedestrians and motorists heading westbound. (*Id.* ¶¶ 18, 19.) At the time of the accident, the conditions surrounding the Livingston Road crossing were considered light volume traffic where crossbucks were considered adequate. (*Id.* ¶¶ 20, 21; Pl's L.R. 56.1(b)(3) Stmt. ¶¶ 4, 10.)

Plaintiff filed a three-count complaint alleging: (1) UP was negligent because it failed to provide additional warning devices at the Livingston crossing; (2) UP's conduct was willful wanton because: (a) it displayed an utter disregard and conscious indifference for Plaintiff's decedents in that it knowingly failed to have adequate warning devices at the Livingston Road crossing, and (b) that it failed to independently evaluate the adequacy of the warning devices at the crossing to determine the need for additional crossings; and (3) Amtrak was negligent because: (a) it failed to properly operate the train, and (b) it failed to provide adequate warning devices at the Livingston crossing. To support its willful and wanton claim, Stalling intends to introduce expert opinion of Dr. Levine to show that based on a cost-benefit analysis, it can be concluded that UP knew of the risks of its crossing, deliberately ignored any measure it could take to enhance their safety, and in return received an economic benefit. Dr. Levine is a transportation economist with a specialization

in the railroad industry. He has earned advanced degrees in economics and business and has conducted economic research for railroads.

## Discussion

In *Daubert v. Merril Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 581 (1993), the Supreme Court held that the standard for admitting expert testimony is embodied in Federal Rule of Evidence 702, which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Essentially, it is the trial court that must determine the admissibility of an expert's testimony. *Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir. 1997) (stating that the district court's role is to be the "gatekeeper" and must decide whether an expert testimony should be admitted based not upon an expert's conclusions, but upon his methodology.) *Daubert* also tells us that the trial court should be given "broad latitude" to decide whether an expert's testimony satisfies its factors and whether that testimony is reliable. *Loeffel Steel Prods. v. Delta Brands*, No. 01 C 9389 2005 U.S. Dist. LEXIS 11601, *41 (N.D. Ill. June 9, 2005).

The district court is to engage in a two-step process to determine whether an expert testimony should be admitted. *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir. 1994). The district court must initially decide whether an expert testimony is based on scientific knowledge. That is, the court must determine whether the opinion is created out of the scientific method to ensure that it is not based on "subjective belief or unsupported speculation."

*Porter v. Whitehall Lab.*, 9 F.3d 607, 614 (7th Cir. 1993) (quoting *Daubert*, 509 U.S. at 590); *Wintz*, 110 F.3d at 512. The scientific method is one that is applied to identify and analyze issues and to create and test hypotheses to ensure that the conclusions are sound. *Abu-Hashish v. Scottsdale Ins. Co.*, 88 F. Supp. 2d 906, 908 (N.D. Ill. 2000). The Seventh Circuit has held that a scientist's personal observation does not, in and of itself, amount to an established methodology based on scientific fact. *Wintz*, 110 F. 3d at 516. "An expert's declaration, full of assertion but empty of facts and reasons" is not sufficient to establish the scientific method. *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) (noting that the trial court must look past the final conclusion of the expert and adjudge whether it is adequately reliable). To determine whether a theory is based on the scientific method, some factors to consider are: (1) whether a theory is able to be tested; (2) whether the theory has been subjected to peer review; (3) the known or potential rate of error; (4) whether the theory is a scientific method; and (5) the general acceptance of the theory. *Daubert*, 509 U.S. at 593-94.

The next step the district court must take is to consider whether the expert's knowledge, experience, and opinions would assist the trier of fact to better understand factual issues. *Porter*, 9 F.3d at 614. That is, the expert's testimony must be tied to an issue in the case and if does not relate to an issue in the case, then it will not be consider as helpful to the trier of fact. *See Daubert*, 509 U.S. at 590. It is the proponent of the expert testimony who bears the burden of establishing a testimony's admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592.

Dr. Levine does possess the qualifications of an expert in economy with a focus on the railroad industry. However, in conducting our two step-analysis to determine the admissibility of Dr. Levine's testimony, his opinion must be based on a recognized foundation. Defendants' motion

challenges Dr. Levine's methodology and claims that his conclusions are baseless; he makes his report on contrived figures; he has not tested his hypothesis; and he has not tied his conclusions to scientific data. We agree and believe that in light of his testimony and support thereof, there is far too great of a gap between Levine's analytical data and his proffered opinion to determine that his conclusions were based on the scientific method. Plaintiff has failed to demonstrate how Levine's hypothesis has been verified through testing; how his theories tie to known scientific conclusions; that his theory has been subjected to peer review; the known potential rate of error; and the general acceptance in the scientific community. We do not dispute Levine's definitions of economics or the purpose and value of a cost/benefit analysis. What is lacking is the bridge between these accepted scientific processes and Levine's conclusions.

Dr. Levine states his testimony is based upon the comparison of UP's annual net profit with the amount of money UP spends on crossing safety. Dr. Levine bases the bulk of his testimony on his own nation-wide assessment of railroad crossing safety; depositions of UP employees from other cases, depositions relating to the present case; text-book definitions of economics and economic related articles; UP's Crossing Resource Manual, UP's annual reports, and Federal Highway handbooks. In his calculations, Levine uses only national figures and has failed to gather specific data regarding Illinois expenses, profits and finances to assess the cost-benefit plan that UP has chosen to follow. He admits that he did not test his theory that led him to conclude that UP intentionally ignores safety measures and chooses to profit monetarily from that choice. Essentially, Levine made no effort to tie his findings to the crossing at issue here, or even to crossings in Illinois.

Defendants also argue that Dr. Levine should not be allowed to testify because his testimony is merely "parroting [P]laintiff's theme." Defendants state that Levine does not use actual figures

linked to UP's safety expenditures and that he essentially makes up a number to support his conclusions. Without having precise figures, Levine concedes that he assumed, because the railroad had not published the information, that UP had not allotted any money towards upgrade improvement. He assumes that the expenditures were zero and uses that number to conduct his cost-benefit analysis. In short, Dr. Levine admits that if he had information to show that UP did allot for upgrades on crossing, then his hypothesis and testing would need to be changed. Also, Dr. Levine states that he does not know if UP has a state-based initiative to upgrade crossings and acknowledges that if Illinois did have such projects already in place, his opinions and conclusions could also be affected. Moreover, he admits that although there are other measures that UP could take to enhance the safety of the crossing, he did not know whether or not UP engaged in any other safety measures prior to forming his conclusions. He chooses not to consider capital costs, which includes training costs, and he is not certain as to what comprises the costs he did use to assess UP's cost-benefit analysis.

Plaintiff contends that a scientific method need not prove a conclusion to a scientific certainty. Instead, Plaintiff states that conclusions may be inferred if they are "derived by the scientific method." (Pl's Resp. Defs' Mot. Bar Test.) Plaintiff avers that Dr. Levine's failure to consider Illinois-specific and non-capital expenditures do not preclude his testimony. Rather, Plaintiff asserts that Dr. Levine's national assessment of UP is sufficient and that Dr. Levine intended to speak to the nation-wide efforts and economic motives of UP. Levine wanted to convey that, as a national company, UP has chosen to forfeit nation-wide safety for economic reasons. Plaintiff believes that Levine offered a hypothesis and adequately used the scientific method by citing economic literature and textbooks to show the cost-benefit analysis is a scientific method.

We agree, to be admissible, Dr. Levine's testimony must be derived by the scientific method. Here, Dr. Levine submitted a fourteen page report discussing his analysis. However, Plaintiff has failed to demonstrate how Dr. Levine's theories have been tested and how the data compels him to leap to his conclusions that UP was making a cost-benefit choice in not upgrading the crossings. Levine's methodology consists of evaluating incomplete facts in light of UP policies and using his own knowledge of railroads and economics. We believe that Dr. Levine's conclusions lack testing and scientific reliability because his conclusions were made without complete data and he fails to demonstrate how his theory has been tested, been subjected to peer review, and what the known error rate is. Levine has not shown us how he has tied his conclusions to known scientific data by failing to demonstrate how his cost-benefit analysis has led him to his hypothesis and theories. Without explaining this progression, we cannot support that his opinions satisfy *Daubert*. We may not take Dr. Levine's personal observations and consider them a methodology based in fact. As we are the gatekeepers, we must see how the testimony fits the case and we find it does not. Thus, Defendant's motion to bar Dr. Levine's testimony shall be granted.

## CONCLUSION

Plaintiff has failed to demonstrate that the opinions of Dr. Levine concerning UP's safety policy and motives are grounded in sound methodology. Consequently, the testimony of Dr. Levine is not admissible under Rule 702 and *Daubert*. Thus, UP's motion to bar Dr. Levine's testimony is granted.

ENTER:

DATED: JUL 1 2 2005

UNITED STATES DISTRICT JUDGE