

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY STALLING, Special )
Administrator of the Estates of BECKY )
R. STALLING and RYAN NICHOL )
STALLING, )
      Plaintiff, )
)
v. )  No. 01 C 1056
)  Paul E. Plunkett, Senior Judge
UNION PACIFIC RAILROAD COMPANY )
and NATIONAL RAILROAD PASSENGER )
CORPORATION d/b/a AMTRAK )
)
      Defendants. )

## MEMORANDUM OPINION AND ORDER

Gregory Stalling ("Plaintiff") has filed a three-count complaint against Union Pacific Railroad Company ("UP") and National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak") or collectively ("Defendants") for their negligence and willful and wanton conduct. This matter is before us pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367. Defendants have filed a Rule 56 motion for summary judgment on all counts. After a review of the evidence, we conclude that as to Counts I and III, there are unresolved material issues of fact which are fatal to Defendants' motion. As to Count II, Defendants' motion for summary judgment is granted.

### Background

Unless otherwise noted, the following facts are undisputed. On January 14, 2001, at approximately 5:00 p.m. Becky Stalling was driving through the Livingston Road railroad crossing when her van was struck by a train. The Livingston train tracks are located in Dwight, Illinois and are owned by UP. The train is owned and operated by Amtrak.

At that time, the Livingston crossing displayed advanced warning signs to indicate a railroad ahead, as well as reflective crossbucks on each side of the crossing. Crossbuck signs are white regulatory, X-shaped signs with the words "Railroad Crossing" in black lettering written on them and they indicate that there are railroad tracks ahead. The crossbucks also had reflective tape placed on them, were in good condition and were able to be seen at night by approaching drivers (Defs.' L.R. 56.1(a)(3) Stmt. ¶¶ 16, 17.) Crossbucks are the equivalent of yield signs and in January 2001, they were not obstructed and were clear to pedestrians and motorists heading westbound. (*Id.* ¶¶ 18, 19.) In certain situations, these warnings are considered to adequately warn the public of approaching trains. There are certain crossings, however, that require flashing lights and/or gates. The appropriate warning system is determined by several factors including: vehicular and train speed and volume; dimensions, characteristics, and angle of the roadway and the tracks; sight obstructions and restrictions; accident history; and school busses or trucks carrying hazardous material operating through the crossing. (Pl.'s Resp. Defs.' L.R. 56.1(a)(3) ¶¶ 98, 99, 131; Defs.' Resp. Pl.'s L.R. 56.1(b)(3) Stmt. ¶¶ 98, 99.) Flashing lights are considered an upgrade from crossbuck signs because the level of safety has been shown to increase with their presence. (Pl.'s L.R.56.1(b)(3) Stmt. ¶¶ 124, 125, 127.)

In January 2001, vehicular traffic in this rural farming community was light, with only 40-75 vehicles and 7-10 trains passing per day. (*Id.* ¶¶ 20, 21; Pl.'s Resp. Defs.' L.R. 56.1(a)(3) ¶¶ 4, 10.) Livingston Road and the railroad tracks intersect at a 45-60 degree angle. (*Id.* ¶ 13; Defs.' L.R. 56.1(a)(3) Stmt. ¶ 13.) A farm service company called Grainco maintains an office building and a larger storage facility just adjacent to the crossing located in the northeast quadrant of the Livingston railroad crossing. (Pl.'s Resp. Defs.' L.R. 56.1(a)(3) ¶¶ 15, 16.) There is also a MCI

communications building located 130 feet from the east rail in that same quadrant. (*Id.* ¶ 18.) When a motorist is more than 130 feet away from the crossing, these buildings may impose sight obstructions. However, Defendants contend that when a motorist is closer than 130 feet, there are no sight obstructions. (*Id.* ¶ 19; Pl.'s Resp. Defs' L.R. 56.1(a)(3) ¶ 19.) The Dwight Township road commissioner testified that he has had concerns about these obstructions since 1997. (Pl.'s Resp. Defs.' L.R. 56.1(a)(3) ¶ 24.) The crossing was a mail route, a school bus route, and a passage for trucks carrying hazardous material. (*Id.* ¶¶ 26, 34-46.)

On January 14, 2001, Amtrak Train #305, operated by William Hartmann, was headed southbound and collided with Stalling's westbound van. The train's headlights, which allow the train to be seen over a quarter mile away, were on and bright at the time of the accident. (*Id.* ¶¶ 26, 28.) The driver, Becky Stalling, passed the advance warning signs, the reflectorized crossbuck and the passing track just before reaching the main line on which train #305 was operating. (*Id.* ¶ 30.) At that time of the collision, the train was operating within the federal speed limit and was moving at about 74-75 m.p.h. (*Id.* ¶¶ 33-35.) The conductor testified that the van was going 10-15 m.p.h. and thought the van would stop before coming onto the track. (Defs.' L.R. 56.1(a)(3) Stmt. ¶ 31.) Even though the Livingston crossing was not equipped with lights on January 14, 2001, Hartmann informed police that he saw red crossing lights that were working right before the collision. (Pl.'s Resp. Defs' L.R. 56.1(a)(3) ¶¶ 69-70.) It is disputed whether the train's horn was properly sounded at the Livingston Road crossing. (*Id.* ¶¶ 71-79.) Hartmann states that at the time of collision, it was partly cloudy with a slight rain. (Pl.'s Resp. Defs.' L.R. 56.1(a)(3) ¶ 54.) By contrast, Captain John Johnson of the Livingston County Sheriff's Police Department investigated the scene of the accident

and testified that the weather was overcast, but not foggy or snowing. (Defs.' L.R. 56.1(a)(3) Stmt. ¶¶ 39, 40.)

As provided by Illinois law, when approaching a railroad crossing, a driver is obligated to stop within in 15-50 feet from the first rail and may not proceed further until she may safely do so. (*Id.* ¶ 76.) At the Livingston crossing, provided a westbound driver looks 105-127 degrees over her right shoulder, there are no visual obstructions to that driver on the railroad property, there is nothing to restrict a driver's view from an approaching train, and a motorist with normal vision should see one-half mile, or if the driver is within 120 feet of the crossing the vision would be 1,000 feet. (*Id.* ¶¶ 80-84.) Before the collision, Hartmann noted that the van did not change speed and because he was certain of impact, he applied the emergency brake at approximately 120-140 feet from the collision (Pl.'s Resp. Defs'. L.R. 56.1(a)(3) ¶¶ 62, 63.)

Though disputed, Defendants' expert, James Loumiet, testified that Hartmann applied the emergency brake when the train was 241 feet, or 2.2 seconds before impact. (Defs.' L.R. 56.1(a)(3) Stmt. ¶ 37.) Defendants' expert also submits that a reaction time of 1-1.25 is considered normal for an alert driver. In Becky Stalling's case, with that reaction time combined with her rate of speed, she could have stopped her car within 29-97 feet of when she knew of the train's presence. (*Id.* ¶¶ 91, 96-99.) Factoring in the possibility of a wet pavement, Defendants say if Stalling had properly looked, she could have stopped between 95-109.67 feet if she was going as fast as 30 mph. (*Id.* ¶¶ 100, 101.) However, there were no skid marks found at the location of the accident. (Pl.'s Resp. Defs.' L.R. 56.1(a)(3) ¶ 67.) Also, there has been no evidence presented to show that Becky Stalling looked for a train on her approach to the Livingston crossing, whether she was listening for the train horn, or whether she took any affirmative steps to avoid the collision. (Defs.' L.R. 56.1(a)(3) Stmt.

¶¶ 102-104.) Despite the contentions of local residents that they encountered near misses at the Livingston crossing prior to the collision on January 14, 2001, there is no evidence that UP had received complaints about the level of devices at the Livingston crossing. (*Id.* ¶¶ 47, 51, 53, 69.) Also there had not been a collision at that location since 1971. (*Id.* ¶ 70.)

The Illinois Commerce Commission ("ICC") is responsible for rail safety matters within the state, and it follows guidelines established by the Federal Railroad Crossing Program ("Federal Program") to evaluate and upgrade railroad crossings. Under the Federal Program, the safety of crossings is considered a joint responsibility between the governmental agency, the state, and the railroad operator, with the selection of warning devices determined by the governmental agency, the evaluations of the crossing to be completed by the states, and the diagnostic figures and conditions to be provided by the railroad. In Illinois, the ICC also uses a collaborative or team approach and has adopted the Manual on Uniform Traffic Control Devices ("MUTCD"), which states that the need and selection of warning devices is to be determined by a regulatory public agency, such as the ICC.

In this cooperative approach, the railroad must provide information about the tracks, train volume and speed and must contribute to paying for new devices when they are installed. It is UP's own policy to work in conjunction with the states to comply with the federal guidelines. (Pl.'s Resp. Defs.' L.R. 56.1(a)(3) ¶¶ 71-73.) Each year, the ICC examines each public railroad crossing and according to the testimony of ICC representatives in late 2000, it was determined that all crossings located on the route from Chicago to St. Louis, a corridor which included the Livingston crossing, were deemed part of a "high speed rail project" and were to receive warning device upgrades. (*Id.* ¶¶ 66, 67.) Plaintiff maintains that this particular study, as well as all annual evaluations, are not always official diagnostic engineering studies. (*Id.* ¶ 66.)

Although the ICC is expressly authorized to conduct such studies and issue upgrade orders after conducting official diagnostic engineering studies, a railroad need not wait for these state decisions to upgrade and may, with ICC approval, initiate and wholly pay for the installation of automatic gates and lights. ( Pl.'s Resp. Defs.' L.R. 56.1(a)(3) ¶¶ 96, 136.) UP's policy and practice did not require such self-initiated annual evaluations of warning devices without public or state involvement. (Pl.'s L.R.56.1(b)(3) Stmt. ¶¶ 119, 123.) UP's Claims Manual was effective the date of the collision and affirmatively states that if a motorist's ability to see or hear a warning is impeded, the railroad may have a heightened duty to install additional safety devices. (*Id.* ¶ 142.)

Plaintiff filed a three-count complaint alleging that: (1) UP was negligent because it failed to provide additional warning devices at the Livingston crossing; (2) UP's conduct was willful and wanton because: (a) it displayed an utter disregard and conscious indifference for Plaintiff's decedents in that it knowingly failed to have adequate warning devices at the Livingston Road crossing; and (b) cognizant of the danger, it failed to independently evaluate the adequacy of the warning devices at the crossing to determine the need for additional crossings; and (3) Amtrak was negligent because: (a) it failed to properly operate the train; and (b) it failed to provide adequate warning devices at the Livingston crossing. (Pl.'s Second Am. Compl. ¶¶ 46, 53, 61.)

## The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth

of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

In addition, where "undisputed facts give rise to disputed inferences," summary judgment is not appropriate. *Harley-Davidson Motor Co., Inc. v. Powersports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) ("[T]he choice between reasonable inferences from facts is a function of the fact-finder."); *see also Ramirez v. The Nutrasweet Co.*, No. 95 C 0130 1997 U.S. Dist. Lexis, 17111 at *7 (N.D. Ill. Oct. 27,1997) ("[I]f the evidence presented by the parties is subject to conflicting interpretations, or if reasonable minds could differ as to its significance, summary judgment must not be granted") (citing *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1366 (7th Cir. 1993)).

## Discussion

This Court has diversity jurisdiction under 28 U.S.C. §1332(a)(1). Federal district courts, sitting in diversity, apply the substantive law of the forum state, which compels us to apply Illinois law. *ITQ Lata, LLC v. MB Fin. Bank, N.A.*, 317 F. Supp. 2d 844, 851 (citing *Alper v. Altheimer & Gray*, 257 F.3d 680, 687 (7th Cir. 2000)).

*Count I*

In Count I, Plaintiff alleges that UP was negligent in the wrongful death of his wife and daughter because it failed to inspect and provide additional warning signs. Under Illinois law, to state a claim for wrongful death, Plaintiff must allege that UP owed a duty to the deceased individuals;

-7-

UP breached that duty; the breach proximately caused the death; and monetary damages resulted. *Leavitt v. Farwell Tower Ltd. P'ship*, 252 Ill. App. 3d 260, 264 (1993) (internal citation omitted).

The Secretary of Transportation ("Secretary") has issued a variety of regulations concerning grade crossings that articulates certain statutory duties of the state and the railroad. However, there is also a common law duty of a railroad to ensure that there is adequate warning equipment at each of its crossings. *Bassett v. Burlington N.R.R.*, 131 Ill. App. 3d 807, 813 (1985) (internal citations omitted). The adequacy of a warning is a "question of fact for the jury and should be decided on a case-by-case basis." *e.g. Magna Bank of McLean County v. Ogilvie*, 235 Ill. App. 3d 318, (Ill. App. Ct. 1992). The duty is heightened and the railroad must install automatic flashing lights if a crossing is considered extrahazardous. *Bassett*, 131 Ill. App. 3d at 813. To label a crossing extrahazardous, factors that are considered include visual obstructions, volume and speed of both vehicular and train traffic, the existing characteristics of the track, intersections, and roadways, the angle of the intersection, the character of the surrounding community, and the sight distance. *Baker v. Norfolk & W. Ry.*, 120 Ill. App. 2d 296, 303 (1970). It is strongly held that finding a crossing to be extrahazardous is a decision to be made by the fact-finder. *See id.* Contributory negligence is also a consideration for a jury and is "rarely an issue that can be decided on a motion for summary judgment." *Akerberg v. Metro. Rail*, 773 F. Supp. 111, 114 (N.D. Ill. 1991) (citing *West v. Kirkham*, 207 Ill. App. 3d 954, 958-59 (1991)). Likewise, frequently a jury determines the proximate cause of injury. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252 (1999)(stating "proximate cause is ordinarily a question for the trier of fact"); *see also Sheahan v. N.E. Ill. Reg'l Commuter R.R.*, 212 Ill. App. 3d 732, 736 (1991).

UP agrees it has a duty to provide adequate warning signs and additional warning devices in extrahazardous conditions, but contends that the Livingston crossing was not extrahazardous. UP states the crossbucks at Livingston Road were considered adequate warnings for the light volume and light traffic conditions that existed. (Id. ¶¶ 20, 21; Pl.'s Resp. Defs' L.R. 56.1(a)(3) ¶¶ 4, 10.) UP further states that even if the crossing is considered extrahazardous, UP would prevail because the condition of the crossing was not the proximate cause of the collision. Rather, UP states, it was the negligent driving of Becky Stalling that directly caused the accident.

In a summary judgement motion, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). We feel Plaintiff has done just that. Plaintiff has established that UP had a duty as a railroad to ensure that the warning devices were adequate. Plaintiff has also unveiled several factors that imply the crossing may have been extrahazardous and which, if proven, would mean that UP breached its heightened duty by not installing flashing lights. For example, there were storage facilities and office buildings that Plaintiff contends could have obstructed motorist's views; the 45 to 60 degree angle of the intersection is an awkward and difficult angle to observe oncoming trains; Livingston Road was recently paved and therefore higher speed traffic traversed the tracks; witnesses from the surrounding rural community claimed to have lodged several complaints that the crossing was dangerous because of the train speeds and near misses; school buses full of children are transported daily across the tracks; and hazardous materials are moved through the tracks each day. Furthermore, Plaintiff offers expert testimony that concludes that in light of the angle of approach, motorist's sight distances and obstructed visibility, the crossing was extrahazardous and should have been equipped with gates and lights. (Pl.'s Resp. Defs.' L.R.

56.1(a)(3) ¶ 58.) Therefore, we conclude whether these conditions are extrahazardous is a determination for the jury.

Similarly, the proximate cause and whether contributory negligence precludes UP's liability are also to be examined by the finder of fact. Illinois law tells us that a jury not only determines whether a crossing is extrahazardous, but it also assesses whether a breach was the proximate cause of injury and whether a plaintiff's contributory negligence precludes recovery. These facts must be considered to determine UP's level of duty and whether it satisfied that duty and, therefore, we must reserve such matters for the fact finder. We believe that Plaintiff has raised genuine factual issues that must be presented to a jury and thus, as to Count I, Defendants' motion for summary judgement is denied.

*Count II*

In Count II, as an alternate theory for recovery, Plaintiff claims that his pecuniary damages stemmed from UP's willful and wanton conduct because it displayed an utter disregard and conscious indifference for Plaintiff's decedents when it failed to have adequate warning devices at the Livingston Road crossing. Plaintiff also claims that while knowing the danger, UP failed to have an independent program to evaluate the adequacy of the existing warning devices. To prevail on a claim for willful and wanton misconduct, Plaintiff must establish that UP acted with "reckless disregard for the safety of others . . . [and] that the defendant failed, after knowledge of impending danger, to exercise ordinary care to prevent it or that defendant failed to discover the danger through recklessness or carelessness when it could have been discovered by ordinary care." *Spangenberg v.*

*Verner*, 321 Ill. App. 3d 429, 436 (2001); *Canning v. Barton & Browning-Ferris Indus.*, 264 Ill. App. 3d 952, 955 (1994).

To find that a defendant is guilty of willful and wanton misconduct, Plaintiff must provide evidence that shows that UP had "actual or constructive knowledge that his conduct posed a high probability of serious physical harm to others." *Martin v. Ill. C. G. R.R*, 237 Ill. App. 3d 910, 917 (1991). Although willful and wanton conduct is evident where there is an intentional and conscious disregard for the rights or safety of others, it may also lie where conduct is unintentional and reckless. *Castaneda v. Cmty. Unit Sch. Dist. No. 200*, 268 Ill. App. 3d 99, 103 (1995). If not purposeful, Plaintiff must show that UP chose to act while having knowledge of an impending danger or knowledge that, at least, his conduct would likely cause serious harm to others. *Martin*, 237 Ill. App. 3d. at 917. The facts must affirmatively provide that UP was beyond careless and acted recklessly in not having an independent program to evaluate crossings. *Id.*; *Dunn v. Ill. Cent. Gulf R.R. Co.*, 215 Ill. App. 3d 190, 200-01 (1991) (stating willful and wanton misconduct is seen where a defendant acts with evil motive or reckless indifference to others by "conscious[ly] disregard[ing]" the danger and exposing others to a high risk of harm, even though a mere failure to install flashing lights does not necessarily equal willful and wanton conduct).

Willful and wanton conduct is actually a mix between intentionally tortious activity and simple negligence. *Ziarko v. Soo Line R.R.*, 161 Ill. 2d 267, 274 (1994). Although whether specific acts amount to willful and wanton conduct is ordinarily a question of fact, in some cases, where the evidence overwhelmingly establishes that willful and wanton behavior was not present, the issue will be ruled on as a question of law. *Canning*, 264 Ill. App. 3d at 956; *Prowell v. Loretto Hosp.*, 339 Ill. App. 3d 817, 823 (2003); *Brandon v. Maywood*, 157 F. Supp. 2d 917, 935 (N.D. Ill. 2001)

(stating this is often a question of fact, but if the evidence overwhelmingly favors the defendant then it can be ruled on as a question of law); *Lester v. Chicago Park Dist.*, 159 Ill. App. 3d 1054, 1059 (1987); *Cacia v. Norfolk & W. Ry. Co.*, 290 F.3d 914, 921 (7th Cir. 2002) (defendant not liable for willful and wanton conduct if it made reasonable efforts to ensure the safety of the accident site); *Carter v. Simpson*, 328 F.3d 948, 951-52 (7th Cir. 2003) (stating that even if alleged action was taken, that alone could not uphold a willful and wanton claim). Knowledge of prior accidents and failure to remedy the cause of the accident can support a finding of willful and wanton conduct. *See, e.g., Scarano v. Town of Ela*, 166 Ill. App. 3d 184, (1993). However, having such knowledge but being in full compliance with federal and state standards is not an example of conduct that could be found as willful and wanton. *Cacia*, 290 F.3d at 921 (defendant not liable for willful and wanton conduct if it made reasonable efforts to ensure the safety of the accident site); *see also Alcorn v. Union Pac. R.R. Co. et al*, 50 S.W. 3d 226, 248-49 (Mo. Sup. Ct. 2001).

UP claims that it is ICC's responsibility to determine the number and type of devices at a crossing and accordingly there is no independent duty by the railroads to further evaluate the crossing. UP affirms that it has fulfilled its duty to comply with the ICC guidelines by providing the diagnostic figures of train speed, train volume, and number of tracks. Further, UP argues that any duty to provide additional warning devices or to have an independent evaluation program is not the responsibility of UP, but that of the state or federal agency. Plaintiff states that UP knew that gates and lights would increase safety and its failure to proactively assess the crossing is willful and wanton behavior.

However, the evidence here does not support such allegations. It is undisputed that there had been no accidents at the Livingston crossing since 1971 and that UP did not have any logged

complaints which documented concerns or near misses at the crossing. It is also agreed that UP's approach to upgrading the crossing was appropriate and UP fully complied with state and federal upgrade programs. UP did not violate the law regulating the crossings simply by not having an independent program to inspect.

Plaintiff carries a heavy burden to establish that UP's conduct was intentional or was a conscious and reckless disregard for the safety of others. While Plaintiff has not alleged an intentional act by UP, he has alleged it was careless or reckless. However, Plaintiff does not substantiate its claims with proffered evidence. As discussed, the mere failure to install does not result in willful and wanton behavior. Rather, Plaintiff would had to have shown that there was an absolute disregard of a duty. Plaintiff has failed to do so. Although Plaintiff offers testimony averring UP was aware of the danger and was able to independently initiate the upgrade process, but consciously chose not to, Plaintiff's willful and wanton claim still cannot survive. Viewing the evidence in a light most favorable to Plaintiff, the summary judgment standard does not allow us to rely on a mere scintilla of evidence in order to overcome the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff"). Based on the evidence presented, UP's compliance with state and federal standards with regard to the warning devices at crossings should not be considered as willful and wanton. Thus, Count II of UP's motion for summary judgment is granted.

*Count III*

In Count III, Plaintiff alleges that Amtrak was negligent because it failed to properly operate train #305. Under Illinois law, to state a claim for negligence in wrongful death, Plaintiff must allege that Amtrak owed a duty to the deceased individuals; Amtrak breached that duty; the breach proximately caused the death; and monetary damages resulted. *Leavitt*, 252 Ill. App. 3d at 264 (1993) (internal citation omitted). The Illinois Supreme Court tells us that a railroad has a duty to exercise due care in order to avoid a collision. *Espinoza v. Elgin, Joliet & E. Ry.*, 165 Ill. 2d 107, 115, 120 (1995). The Seventh Circuit has applied Illinois law to similar diversity cases and determined that it is the railroad that must effectively signal a warning as they approach a crossing. *Puckett*, 897 F.2d at 1428. Whether such a warning to motorists is adequate is a fact-specific determination and should be decided on a case-by-case basis. *Bebout v. Norfolk & W. Ry.*, 47 F.3d 876, 878-79 (7th Cir. 1995) (quoting *Magna Bank*, 235 Ill. App. 3d at 324.)

An engineer is required to stop the train when it is apparent that the motorist will not yield. *Robertson v. N.Y. Cent. R.R. Co.*, 388 Ill. 580, 584 (1944); *Brennan v. Wis. Cent.*, 227 Ill. App. 3d 1070, 1084 (1992). Courts have determined that the moment the engineer has a duty to slow is when the driver passes the crossbuck sign. *Brennan*, 227 Ill. App. 3d at 1084. While "the existence of a duty is a question of law for the court to decide . . . [t]he issues of breach and proximate cause are factual matters for a jury to decide." *Espinoza*, 165 Ill. 2d at 114 (1995) (noting that the latter two issues are to be decided by a jury when there is a genuine issue of material fact surrounding those issues); *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252 (1999) (stating "proximate cause is ordinarily a question for the trier of fact"); *Sheahan*, 212 Ill. App. 3d at 736 (1991). Furthermore,

a dispute involving the adequacy or effectiveness of that type of warning signal is certainly a genuine issue of material fact that may not be determined as a matter of law. *Id.*

Amtrak agrees that it must exercise a certain degree of care to avoid a collision. Amtrak contends that because the experts do not dispute at which point the brake was applied, there is no factual dispute. Amtrak also submits that whether the horn was blown is not the proximate cause of the injuries. Amtrak states that even if the timing of the brake application created a question, Plaintiff was required to offer evidence to show that had Hartmann applied the brake sooner, Becky Stalling could have avoided the accident. Amtrak claims that Plaintiff has not done this and without such a showing, its motion for summary judgment should be granted.

Plaintiff must establish a prima facie case of negligence in order to avoid Amtrak's motion for summary judgment. *Leavitt*, 252 Ill. App. 3d at 264 (referring to *Pyne*, 129 Ill. 2d at 358.) We believe he has. Plaintiff has presented sufficient evidence to establish that Amtrak had a duty to operate the train properly and to provide adequate warning signs. Plaintiff has shown breach by offering testimony that Hartmann failed to properly sound his horn to warn Becky Stalling of his approach and failed to apply the emergency brake before the van had actually reached the track.

As to proximate cause, Plaintiff raises questions as to whether, when, and in what manner a whistle was sounded and whether the proper sounding of the whistle would have prevented collision. Plaintiff has sufficiently presented testimony from which we may infer that had a horn been audible to Becky Stalling, there may have been a split-second opportunity for her to react and avoid the collision. As Hartmann testified, he applied the brake when it was apparent to him that the driver of the van did not know he was coming, but he did not see the van earlier because he was focused on other directions. This suggests that he may not have acted properly and there may have

been an opportunity for Becky Stalling to react had the horn blown or had it been blown at the correct time. (Defs.' Mot. Summ. J., Ex. X) Also, Plaintiff's expert suggest that the horn was applied at an inappropriate distance which may have precluded Becky Stalling from being in the direct acoustic area of the horn. Even when a horn has been sounded, juries have found that it was not done so properly and a breach of duty still occurs. *Bebout*, 47 f.3d at 878 (stating that the trial court was told that jury should have been given instructions and the opportunity to determine whether the train sound was adequate) (internal citations omitted). Similarly here, it is disputed whether the train's horn was sounded and whether the warnings were timely. It can be inferred that if the horn was not audible, then that horn was not sounded at the appropriate time.

Also, the fact that Hartmann did not detect the van sooner because he was focused on other directions requires us to look further into whether the train was being operated properly. As stated, unless no reasonable jury could conclude otherwise, the proximate cause is an issue to be determined by the trier of fact. The van's speed, the van's distance from the train when the brake was applied, and whether the horn was timely sounded or blown at all, will all be integral to assist the fact finder in determining the proximate cause of the accident. As we address such questions on a case by case basis and weigh all facts in favor of the non-movant, we believe that the resolution of those inferences are necessary to determine whether Amtrak properly operated the train and whether they properly reacted in the emergency situation. Therefore, we believe it is for a jury to determine how the moments prior to the collision unfolded.

In Count III Plaintiff also alleges that Amtrak was negligent because it failed to provide adequate warning devices at the Livingston crossing. The Illinois Supreme Court tells us that a railroad has a duty to exercise due care in order to provide adequate warning devices at crossings.

*Espanola*, 165 Ill. 2d at 115, 120. Whether the warning devices at a crossing are adequate is also a fact-specific determination and should be decided on a case-by-case basis. *Bebout*, 47 F.3d at 878-79 (7th Cir. 1995). (quoting *Magna Bank of McLean County v. Ogilvie*, 235 Ill. App. 3d 318, 324 (1992) "whether particular warning devices at a rail crossing provide adequate protection are questions of fact for the jury and should be decided on a case-by-case basis.") Furthermore, a dispute involving the adequacy or effectiveness of that type of warning signal is certainly a genuine issue of material fact that may not be determined as a matter of law. *Espinoza*, 165 Ill. 2d at 114.

Amtrak concedes that they join in the safety program with the state, but states that it is the ICC's responsibility to be the keepers of the rail safety. In this joint effort, Amtrak contends that it has no duty to provide warning devices on property it does not own and further avers Plaintiff has not offered case law that imposes such duty. But, as we advised in our July 17, 2003 opinion, Amtrak has not cited, and we could not find, any Illinois law to support its proposition that no duty exists to non-owners. In *Meyer*, this Court discussed a similar contention of Amtrak's and agreed that in Illinois a railroad may initiate upgrades and warning devices of crossing over which it passes, "regardless of ownership of property. *Meyer v. S. Pac. Lines*, 199 F.R.D. 610, 615 (N.D. Ill. 2001).

The rules of the ICC also suggest that Amtrak's contention that it has no duty is incorrect. The ICC rules require rail carriers to "maintain, operate and renew all signs (except advance warning signs, clearance signs, stops signs, and hazard markers), as well as signals and other warning devices of any kind installed at crossings on its line of railroad." ICC Rules, tit. 92, ch. III, subch. c, § 1535.208. The rules define rail carrier as "any person engaged in the transportation of property or passengers for hire by railroad, together with all employees or agents of such person or entity, and *all property used*, controlled, or owned by such person or entity" and railroad as "track and

associated structures . . . and equipment . . . *used* in the transportation of property or passengers by rail. *Id.* § 1535.100; 625 ILL. COMP. STAT. 5/18c-1104(30)-(31) (emphasis added). Thus, the ICC rules make rail carriers, like Amtrak, responsible for the warning devices at the crossings they use, whether or not the carrier owns them. It is unlikely that the ICC would have issued such a rule if Illinois common law vested such responsibility solely in the owner of the property.

Finally, Amtrak argues that Plaintiff's decedents were more than 50% at fault and therefore Plaintiff's recovery should be precluded. Illinois law does state that when a Plaintiff is more than 50% at fault, recovery is precluded. *see* 735 ILCS 5/2-1116 (c). However, the statute defines contributory fault as "any fault on the part of the plaintiff (including but not limited to negligence, assumption of the risk, or willful and wanton misconduct) which is a proximate cause of the death, bodily injury to person, or physical damage to property for which recovery is sought." 735 ILCS 5/2-1116 (b). Because we believe the proximate cause of the injury must be determined by a jury, this claim may not be resolved through summary judgement. As such, as to Count III, Defendants' motion for summary Judgement is also denied.

## Conclusion

For the reasons set forth above, Defendants' motion for Summary Judgement is granted in part and denied in part.

**ENTER:**

_____
**UNITED STATES DISTRICT JUDGE**

**DATED:** AUG 2 2 2005